Thank you, Your Honor. May it please the Court, Thomas Wolfe for Appellant Kinder Morgan Bulk Terminals, Inc. This case, which arises from the collapse of a giant crane during a violent storm, presents two main issues. The first is whether the detailed terms of a written purchase order will be enforced. If the purchase order is enforced, then it was error for the trial court to allow consequential damages, and the judgment below must be reduced by $6.6 million. The second issue, which the Court would reach only if the purchase order is not enforced, is whether the Court erred in allowing expert testimony from someone who admittedly had no expertise, no experience whatsoever with respect to maritime shipping contracts, and the impact of the crane collapse. Turning to the purchase order issue, the trial court found, and I quote, at the time of the bridge crane collapse, Kinder Morgan was unloading coke pursuant to a February 21, 2008 purchase order. But then the Court went on to justify disregarding the expressed terms of that very purchase by finding that it did not, quote, refer specifically to the bridge crane, close quote, and, quote, does not include any terms that can reasonably be construed as authorizing Kinder Morgan to use the bridge crane, close quote. Those findings were plain error. The purchase order states in all caps that it was for unloading up to 500,000 net tons of coke from ships with bridge crane. It also incorporated eight pages of detailed terms and conditions drafted by the buyer, which was R.G. Steele's predecessor. And among those terms, there is one paragraph which is stated in all caps, and that is the paragraph related to consequential damages. This is paragraph 7.6, which says, in no event shall either party be liable to the other under this order for consequential, indirect, or special damages. And it goes on to define indirect damages very broadly. So in place of this written, unambiguous, express contract, on the subject matter of time of the accident, the trial court instead applied an implied in fact contract that it inferred from a course of dealing between the parties. This was error. An implied contract cannot coexist with an express contract on the same subject matter. And indeed, the court never gets to the question of the implied intent of the parties where the parties themselves have a document between them that they have agreed on that expresses their intent, a document that is in writing, which the court here recognized to be in effect as of the day of the accident. And this legal principle that an implied in fact contract cannot coexist with an express contract on the same subject matter is really not even subject to debate. It is quite telling that R.G. Steele was unable to find one case in the history of American jurisprudence that conflicts with this enunciated principle. Nor can there be any doubt that under Maryland law, the purchase order and subsequent performance there under was a binding contract on the parties. Under Maryland law, a purchase order is an offer. The buyer is the master of that offer, can put whatever terms it chooses into the purchase order. And acceptance of that purchase order can occur in one of two ways, either by communication or by simply beginning performance under the purchase order, which is what occurred here. So, you had a defined offer with expressed terms and acceptance of that offer by performance of the purchase order. Neither party at that point was free to disregard the terms of that purchase order. Maryland law routinely enforces the terms of purchase orders and indeed the commercial world runs on purchase orders. It would be destabilizing to commerce to allow parties to disregard their terms. Now, looking at the lease that the court relied on for finding an implied in fact contract, that lease had been between Bethlehem Steele and Kinder Morgan's predecessor, Chesapeake. But if you were properly deemed a holdover tenant, wouldn't the terms of that lease then govern your rights and responsibility? Not with respect to the crane, Your Honor. Certainly not with respect to the crane. And on what basis do you distinguish that? Well, the lease itself, back when it was in effect, distinguished between real property and the use of the crane. You don't think the crane is a fixture to the real property? Well, I don't think. I mean, normally a crane is personal property. The court did not reach that question. It said it wasn't necessarily accepting Kinder Morgan's position that the crane was personality, but it didn't need to reach that question because it found instead this implied in fact contract. But, make no mistake, where there is an express contract on the subject matter of the crane, which is exactly what the purchase order was, then you can't have an implied in fact contract. Even the purchase order terms, those specific terms agreed to in writing would prevail over general terms of the purchase order. And if the lease that is the basis for the holdover tenancy is in writing and signed by predecessors, then it seems to me those would be specific provisions that would prevail over general terms of the purchase order. The district court recognized that the lease was not a written contract. It was an implied in fact contract. But the lease itself was a dead letter by this time, by the time of the accident. And here's why. Bethlehem Steel declared bankruptcy in 2003. I understand that, but my question is still, if you are properly deemed a holdover tenant, then you are bound by those written terms in the lease. But the written terms of the purchase order superseded anything related to that subject matter that may have been in the lease, which had been rejected by the bankruptcy court and not extended by the parties. What the parties did was, after ISG bought the property, Sparrows Point, in 2003, it needed some time to get a feel for its new assets and asked for what the parties referred to as a honeymoon agreement, also called an interim agreement, where it was six months long, let us figure out what we want to do long term. That was extended several times, but at the end of December 2005, it was not extended any further. And so the interim agreement ended at that point. And how do we know that the parties intended instead to refer to the terms of the purchase order thereafter? Because before December 31, 2005, the purchase orders specifically referred to the lease. All of the purchase orders after December 31, 2005, referred not to the lease, but to the terms and conditions of whoever happened to be the owner of the property at that time. Sparrows Point changed hands three times between 2005 and 2008. And in February of 2008, the purchase order that the trial court found to be the one under which Kinder Morgan was operating at the time of the accident, at that time, the owner was a company called ArcelorMittal. But if that transformation occurred, as you argued, that's inconsistent with you being a holdover tenant? It is inconsistent with being a holdover tenant as to the crane, Your Honor. Even the 92 lease treated the real property and the crane separately. There was a crane was there for providing services. And the real property was to be occupied by Kinder Morgan or his predecessor. But where you have, and this is black letter law, where you have an express contract on a subject matter, you cannot have an implied contract on that same subject matter. So it's not a question of, well, you look at this express contract, the purchase order, and only disregard terms of this implied contract, the old lease that had been rejected by the bankruptcy court, and only disregard the actual conflicting terms of that implied contract. You cannot have an implied contract at all with respect to the subject matter of the purchase order. I'm going to switch gears on you and ask you another question. If the purchase order controls, as you contend, that you have no liability, why do you concede negligence would make you liable for the damages attributable to negligence? We're not saying that there was no liability. What we're saying was that there's no liability for consequential damages. That is what is excluded by the purchase order, not liability of any kind. You don't then take the position that the purchase order excludes all liability? No, no, we've never taken that position. There were other arguments that were made at trial, but we're not appealing the judge's adverse rulings on those arguments. What we are appealing is the idea that there could be, or the finding that there was an implied in fact contract, and that the purchase order did not govern, and the trial courts ruling in that respect was plain error, because the trial court stated incorrectly that the purchase order did not refer to the bridge crane, or did not allow any use of the bridge crane. Is there any significance to the fact that purchase orders were always a part of the relationship here, and the other side seems to suggest that these were really mechanical documents that really didn't alter the overarching obligations imposed by the lease, even if it was inspired by its own terms? There's absolutely no basis for arguing that either party was free to disregard the detailed express terms of this purchase order. It is true that as with probably all commercial activity of this type, purchase orders are involved, but the purchase orders are important documents that didn't just refer to a couple of things, and then refer to a master contract. That's not what was going on here. The purchase order had all of the terms that were necessary to have a completely binding contract related to the subject matter of using the crane to unload coke. What if the lease had still been in effect, not a debt letter as you suggest, and then you have this purchase order, which includes a disclaimer of liability, which is inconsistent with the disclaimer in the lease, which one prevailed? I would suggest then that the later one would prevail, that the express terms of the purchase order under which the coke was being unloaded would prevail. That was not the issue, so that issue was never really analyzed. The trial court recognized that the lease was not in effect. It was not an express contract. It had been rejected by the bankruptcy court, had been rejected by the purchaser of the property, and that it had been, the parties had acted for a time as if bound, that was the language used, by the lease. But that period ended. Let me ask you, I want to go back to my negligence question. You acknowledged you were responsible for damages for negligence. Correct. Where did that duty arise if it didn't arise from the terms of the lease? From the common law duty to use the equipment in a safe manner. The finding of the court was that the negligence consisted of, while the crane was being used, using it when it hadn't been maintained properly. That was the negligence. We disagreed with that, but the court found against us and were not appealing that. But that duty was inherent in the use of the crane, to use it safely. The negligence in not using it safely, which the trial court found, caused property damage to get around the economic loss rule. But that was the basis for the finding. But it allowed for recovery only of direct damages under the purchase order, not consequential damages. And keep in mind that the consequential damages, this provision prohibiting consequential damages, protected the buyer, R.G. Steele and his predecessor. There were a number of terms in there that were quite onerous for the seller, that the buyer could be free to disregard. And whether it's boilerplate, boilerplate just means that it's standardized because it's so common in occurrence, it would be odd not to enforce such obligations simply because they're boilerplate. Turning very briefly to the question of- I'm sorry to keep going on, but I'm having trouble understanding. Your position is that there's a common law duty to maintain the item, the equipment, simply because you have rented it or using it? No. No, that's not what I'm saying. There was a common law duty to use the equipment safely because we were given a license to use it to unload the coat. The court found that we were not using it safely because it was used in a condition when it was not maintained. But with respect to the issue of the testimony of Mr. Cohen, well- You've got some time remaining. I can address that on rebuttal, Your Honor. Okay.  May it please the court. My name is Denise Lazar, and I'm here on behalf of R. G. Steele Sparrows Point, LLC. This court should affirm the district court's judgment in full. As Chief Justice has- Judge has noted- A promotion? All right. Yeah. I don't think I have the authority to do that, but- I'd actually run away from that. Kinder Morgan does not challenge the ruling that it is negligent, and it's Kinder Morgan's negligence that caused the collapse. And it was the district court's factual findings that led the court to determine, sitting as a fact finder, that there was an implied-in-fact contract. So indeed, that is not a- That implied-in-fact contract, you have to look at the facts. That isn't something that you can decide as a matter of law. The district court, in its factual analysis, listened to the witnesses, he read the lease, he looked at the contemporaneous documents, and it was from all of that conduct that he determined that there was an implied-in-fact contract. So if you decide, if you think that the purchase order should control you, you first have to address the implied-in-fact contract, because it would be- You have to apply the clear error standard if you're going to reverse the district court on that basis. Well, I think Mr. Wolf's point is that even if the facts show, or otherwise show, an implied-in-fact contract, you can't have one in this case because of the express agreement that is in the purchase order. Well, the purchase order is, as the record shows, they were used back to the Bethlehem days before, after, during the lease. And they were used for the purpose of making payment. Now this purchase order referred to 500,000 net tons with the bridge crane. Another purchase order that was issued for PCI coal within three days of that said X number of net tons, PCI coal, no reference to the bridge crane. Then you have two days after that, Dennis Brady of Kinder Morgan issuing a billing document to send an invoice to the mill, and it says, PCI coal, this is governed by the second amendment to the, the fourth amendment to the second amended lease. So you have the parties sometimes referring to the lease, sometimes referring to the bridge crane, sometimes not. These documents are for the purpose of facilitating payment. The parties always followed the lease. If you look at their, even on June 4th, 08, which is the day of the accident, if you look at Art Rudolph, who's a Kinder Morgan executive, at the joint appendix 934, he sends an email to his higher ups and said, the lease has expired, but we're operating in good faith under the lease. It's our obligation to operate and maintain this crane. There's nothing in that purchase order that says anything about maintaining the crane. And the record's clear. Kinder Morgan was spending millions of dollars maintaining that crane. Who would spend millions of dollars maintaining a piece of equipment if they weren't obligated to? Kinder Morgan's a huge company. There's no way they would do something they weren't obligated to do. They were obligated under the lease as an implied in fact contract. Now, you do have the alternative of finding them that they're a holdover tenant. And I think that the record also supports that, that Kinder Morgan continuously occupied not only the A yard, which is about 10 acres, they also occupied another 16 acres, including office buildings for which they paid rent, they paid for utilities, they paid for electricity. When OSHA came, who did OSHA come and talk to? They came and talked to Kinder Morgan, because Kinder Morgan was responsible for the safety of that bridge crane. And it was Kinder Morgan who was cited. Not covered in the purchase order. The only place those obligations are covered is in the terms of the lease. Where do you think the duty came from that was the basis for their negligence, Bertie? They had an obligation to maintain the crane in a safe working order. And I believe it arose under their obligations under the lease, that they had accepted those obligations. And they either removed or did not supply the crane with automatic rail clamps, which are number one, required by OSHA. And number two, it was proven that they are required as an industry standard. That it's industry custom and standard for a crane of this size to use automatic rail clamps. Now, you've got to remember, this isn't a building crane. This crane fills, it's 160 feet tall, 600 feet long. It runs on rails that are, double sets of rails, 1,100 feet. We're talking about a massive piece of equipment. This isn't, two words in a purchase order don't tell a company, yes, you're responsible for everything to do with this, with this bridge crane. In addition to, in addition to the maintaining, Kinder Morgan also paid wharfage, which were fees for using the bridge crane, or a wharf for its own purposes. And that was only under the lease. It paid the rent. It paid the electricity back to the mill for the bridge crane. And you know, I'd like to turn, I know that my colleague has not gotten to this yet, but I would like to talk about the, about the expert, Mr. Cohen. Mr. Cohen, and I'd ask you to consider his qualifications, which are in the record. He testified, he's a University of Chicago educated economist. He has a bachelor's degree and an MBA. He testified that he's been in the field for 25 years providing economic consulting services. He's had 10 to 20 engagements for the government, the Department of Justice and FTC included. And he testified about the damages in this case, all of which had been collected, the data collected real time. So the damages, the underlying data that were under his opinion, which is Exhibit 151, of which you have a piece, were admitted through Jeff Genuso, who is RG's controller. All of those damages and all of that backup was collected real time, because obviously this crane came down. That was a big deal. The emergency charges, the estimates to repair the conveyor, keeping track of the demerge, these are things that were being tracked at the time. And what Mr. Cohen did was took that evidence, reviewed it, vetted it, made sure it was as conservative as possible. You know, where Kinder Morgan had one number and the shipowner had another number, he went with the most conservative. So you should give even greater deference to the assessments that he made, because they penned on credibility and weighing the conflicting evidence. So Mr. Cohen wasn't accepted completely. The judge, in fact, said there were certain categories of damages that he would not accept at all. He reduced other aspects of the damages. And the judge also looked to Dennis Brady, who is Kinder Morgan's senior account manager. Not an expert, but certainly qualified to talk about Kinder Morgan's invoices. And the numbers that Dennis Brady arrived at were the numbers that the court accepted for stevedoring services and stacking services. So, this idea that the court was only relying on Jeff Cohen for damages is not shown in the record, and it's certainly not shown in his opinion. He does refer to Mr. Genuso on at least one occasion. Do you have any questions for me? I feel this case is very straightforward, so I don't have any other prepared remarks for you. All right. I think we understand your position. Thank you. Mr. Wolf? Thank you, Your Honor. There is nothing inconsistent between the old lease and the parties agreeing that with respect to future use of the crane, after the honeymoon period had ended, they would use different terms and conditions. And you can most clearly see this if you think about Kinder Morgan trying to enforce a claim for consequential damages against RG Steel in the face of this purchase order. There's no way they'd be able to do it. If you look at the letter that was written in 2008, May of 2008, Severstall purchased the Sparrows Point. On May 1, 2008, the Vice President of Transportation and Purchasing for Severstall wrote to Kinder Morgan and other suppliers and said, we're buying the terms and conditions that you're attached. That letter of May 1, 2008, this is five weeks before the accident, attached the AMUSA 100 terms and conditions so that there could be absolutely no misunderstanding about what terms and conditions applied at the time. And then five weeks later, we have the accident. And for Kinder Morgan to pretend at that point that, well, we weren't bound by these terms and conditions that are expressly incorporated into the purchase order and that you just reminded us are in effect, that would be ludicrous. The parties, as I say, were free to change in February of 2008 the terms and conditions that they were operating on, and they did so unequivocally. The fact that somebody, an employee at Kinder Morgan, thought that the lease was still in effect is legally irrelevant. The parties had a written express contract. And somebody's subjective thought about it is not going to change that fact, nor is referring to the lease in an invoice after the performance of service on a different issue, I might add. It's not the Coke, but that is the February 21, 2008 purchase order, but PCI Coal. The fact that in that invoice, they referred to the lease is of no moment. Well, Ms. Lazar made reference to a separate purchase order which did not refer to the crane. What's the legal significance of that? None whatsoever, because there's no question, and this is what the trial court found, that at the time of the accident, Kinder Morgan was operating under the purchase order, which the court said did not refer to the crane, but which did. That it was unloading Coke, which was the subject matter of that purchase order. So what was said in other purchase orders is really not relevant. Turning very briefly to the testimony of the expert witness, Jeffrey Cohen. He was undoubtedly an expert on some things. He was not an expert on maritime shipping contracts. And he made assumptions without foundation that were the basis of his conclusion that all of the increased demerge after the event was due to the collapse of the crane. But he didn't consider other relevant factors, such as what other effect did the storm have on the rest of the property? What was the weather during that period? What was the history of those particular ships that came in? And how were they being unloaded? They were all unloaded either to other ships or rail cars or trucks, and that makes a big difference in the demerge. Why doesn't that just go to his credibility? Because as this court said in Cooper v. Smith in 2001, an expert doesn't have to exclude every conceivable alternate cause. But it is important that the reasonably likely other causes at least be considered. And that the purpose of the gatekeeping function of Federal Rule of Evidence 702 is to make sure that an expert who's testifying in the courtroom applies the same rigor that would be applied in a similar analysis in his profession. Here, if you ask this expert to isolate the impact of the collapse of the crane on the damages that have been allegedly incurred, and he came back and said, well, I looked at this one factor and assumed that the others did not apply, that would not be accepted because it is not a reasonable analysis. And if you look at, analogize it to a construction delay claim, such a single-factor analysis would never be accepted by this court. And for these reasons, Your Honors, we ask that the judgment below be reduced by $6.6 million. Thank you. Thank you, Mr. Bull. I will come down and recount. Well, I'm going to ask the clerk to adjourn the court, then we'll come down and recount. This Honorable Board of Trustees adjourns until tomorrow morning at 830. I say to the United States, and this Honorable Board of Trustees.
judges: William B. Traxler Jr., Albert Diaz, Stephanie D. Thacker